UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| WCM,<br>also known as William C. Marceau,<br><br>        Plaintiff,<br><br>v.<br><br>U.S. Bank National Association ND, a North Dakota Corporation also known as U.S. Bank National Association,<br><br>        Defendant. | Civ. No. 11-480 (MJD/JJK)<br><br><br><br>**REPORT AND RECOMMENDATION** |

WCM, also known as William C. Marceau, 5400 Opportunity Court, Suite 150, Minnetonka, MN 55343, pro se.

Charles F. Webber, Esq., Erin L. Hoffman, Esq., Faegre & Benson LLP.

## INTRODUCTION

This matter is before the Court on the Plaintiff's Motion for Temporary Restraining Order. (Doc. No. 21.) The matter has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, this Court recommends that Plaintiff's motion be denied.

## BACKGROUND

Plaintiff took out a home equity line of credit with Defendant U.S. Bank

1

National Association ND ("U.S. Bank") on December 6, 2000.  Plaintiff and co-borrower Rachelle Marceau signed a loan agreement containing the terms that govern the available credit line.  (Doc. No. 29 at 4 of 15.)  The line is secured by a statutory mortgage on Plaintiff's property in Wayzata, Minnesota.  (Doc. No. 15, Am. Compl. at Ex. 1.)

The terms of the loan agreement provide for a line of credit with a total limit of $250,000.  The first ten years of the loan agreement constituted the "Draw Period," during which Plaintiff could draw on (i.e., borrow money on) the line of credit.  The draws could be in the form of requests by Plaintiff to borrow money, or in the form of overdraft protection for a deposit account that was linked to the line of credit (i.e., if Plaintiff overdrew on his account, money from the line of credit would be automatically advanced to cover the overdraft).  After ten years (on December 6, 2010), the line of credit matured, Plaintiff was no longer able to draw on the line of credit, and the line of credit entered the "Repayment Period." During the Repayment Period, Plaintiff and his co-borrower are responsible to pay off the balance over 240 months.

During the course of the Draw Period from 2000 to 2010, the balance of the credit line varied, and at several points in 2008 the balance fell to zero. (Doc. No. 27, Decl. of Mitchell C. Norman in Support of U.S. Bank's Mem. in Opp'n to Pl.'s Mot. for TRO ("Norman Decl.") ¶ 8, Ex. C.)  On or about February 27, 2008,

for example, the line of credit was paid down to a balance of zero and Plaintiff at that time had someone at U.S. Bank stamp a copy of the U.S. Bank Home Equity Line Agreement "PAID 2/25/08." (Am. Compl. at Ex. 2; Norman Decl. at Ex. C.) But each time the balance fell to zero, Plaintiff would draw on the line of credit in the form of overdraft protection for the linked deposit account. (*Id.*) The balance on the credit line eventually reached $250,000 by September 2008, and remained near that level until the line of credit matured on December 6, 2010. (*Id.* ¶ 9, Ex. C.)

The terms of the loan agreement allowed U.S. Bank to withdraw payments for the amounts used from the credit line from a linked deposit account. (Am. Compl. at Ex. 2.) In December 2009, Plaintiff authorized U.S. Bank to take payments on the line of credit from an additional deposit account at Beacon Bank. (Norman Decl. ¶ 7, Ex. B.)[1] Since the line of credit matured in December 2010, the automatic payments from the deposit account have gone toward both principal and interest. (*Id.* ¶ 11.)

In July 2010, Plaintiff sent a request to U.S. Bank to release the mortgage that secured repayment of the line of credit, but the line had a significant balance due, and U.S. Bank did not release the mortgage.

---

[1]  At the hearing, Plaintiff asserted that he thought that this document related to payments on his first mortgage. However, the face of the document clearly indicates the transfer payments were to be made to the -0198 account, which was the credit-line account.

3

In December 2010, when the Draw Period ended and the credit line matured, U.S. Bank notified Plaintiff that the line of credit had matured and informed him of various options for repayment or refinancing the line of credit. (Am. Compl. at Ex. 3.)  Rather than contacting U.S. Bank to follow up on his options, Plaintiff sued U.S. Bank. (Doc. No. 1.) U.S. Bank records show that Plaintiff owed approximately a quarter million dollars on the line of credit in December 2010, and the current principal balance on the line of credit is $245,138.27. (Norman Decl. ¶ 12, Ex. C.)

Plaintiff alleges that U.S Bank has no valid agreement with him, that the line of credit was paid off in 2008, that U.S. Bank wrongfully failed to release the statutory mortgage securing the line of credit, and that U.S. Bank has been unjustified in withdrawing money from his accounts to make monthly payments for the past two years. Plaintiff bases his claim on the fact that on several occasions in 2008 the balance on the line of credit dropped to zero. However, each time this happened, money would be drawn from the line-of-credit account within a few days, as overdraft protection for the linked deposit account. A U.S. Bank Customer Service Manager explains:

> Each time, within days, money was drawn on the Line as overdraft protection for the deposit account ending in -1543. After the last time the Line was paid to a zero balance, on April 21, 2008, the very next day, April 22, 2008, $600 was advanced on the Line as overdraft protection for the deposit account ending in -1543. By September 18, 2008, the Line reached its $250,000 limit when

> $169,704.54 was advanced on the Line as overdraft protection for the deposit account ending in -1543.

(Norman Decl. ¶ 9.)

Plaintiff also relies on the fact that in February 2008, when the line-of-credit balance was down to zero, U.S. Bank stamped the Loan Agreement "Paid" and apparently returned it to Plaintiff. Plaintiff contends that, at that time, he requested U.S. Bank "to release the 2nd mortgage and return the loan agreement to [Plaintiff]." (Doc. No. 22, Mem. in Supp. of TRO ("Pl. Mem.") 2.) U.S. Bank gives the following explanation about the significance of this:

> Although Mr. Marceau submitted a copy of the Home Equity Line Agreement that is stamped paid, that is insufficient to release the Mortgage on the property and to close the Line. He would have had to submit a written request to U.S. Bank asking to close the Line. To release the Mortgage, the Line would have to be closed with no balance. Because this was not done, the Line remained open and continued to serve as overdraft protection for the deposit account ending in -1543.

(Norman Decl. ¶ 10.)

The record reflects that Plaintiff continued to use the home equity line of credit after February 27, 2008, the date on the "Paid" stamp. Both advances on the line were taken as overdraft protection and regular payments on the line-of-credit account were made by Plaintiff after that time. For example, the bank records show that on September 18, 2008, the bank advanced Plaintiff $169,704.54 on the line of credit to cover a check that he had written for above that amount. Plaintiff, however, stated at the hearing that he did not recall this

5

particular advance taken on the credit line.  He claimed that he did not recall how the transactions worked during this point in time because he phased out of doing business with that bank at that time.  This Court was, to say the least, skeptical about Plaintiff's statements, and cautioned Plaintiff that he must be careful in this federal court proceeding to proceed in full candor and good faith in pursuit of his claims.

As noted above, by September 18, 2008, "the Line reached its $250,000 limit when $169,704.54 was advanced on the line as overdraft protection for the deposit account . . . ."  (*Id.* ¶ 9.)  When the Draw Period ended and the line of credit "matured" on December 6, 2010, Plaintiff was notified that, per the terms of the Loan Agreement, the repayment period would start and payments on the $250,000 line-of-credit balance would be drawn monthly from the designated deposit account.

Plaintiff now seeks a temporary restraining order to restrain U.S. Bank from "continued withdrawal for funds from Plaintiff's bank account and that all credit reporting be stayed."  (Pl. Mem. 3.)  For the following reasons, this Court recommends that Plaintiff's motion be denied.

## DISCUSSION

I.   **Standard for Temporary Restraining Order**

A temporary restraining order may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the restraining order; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  None of the factors by itself is determinative; rather, in each case the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief.  *Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1041 (8th Cir. 2003); *West Publ'g Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986).  The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987); *see also Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

II.   **Analysis**

   A.   **Likelihood of Success on the Merits**

As the above recitation of the background shows, Plaintiff has not established that he is likely to prevail on the merits of his breach-of-contract and unjust-enrichment claims.  There is no dispute that Plaintiff entered into the U.S.

7

Bank Home Equity Line Agreement and took advantage of the line of credit to the full extent. By the end of the ten-year period of the available line of credit, the balance owed was very near the $250,000 limit. The terms of the loan agreement clearly set forth Plaintiff's obligations during the repayment period commencing in December 2010. Under those obligations, on December 19, 2009, which was well after the date Plaintiff claims the agreement was terminated (i.e., February 2008), Plaintiff authorized U.S. Bank to take automatic payments from his checking account number -5065 at Beacon Bank. It appears true that in February 2008, when the line of credit was down to a zero balance, U.S. Bank stamped the loan agreement "Paid 2/25/08." Plaintiff contends that this was in response to his request to U.S. Bank to release the second mortgage that secured the line of credit and to return the loan agreement. But there is no evidence, at least at this point, that the line of credit was ever closed or the mortgage released. Indeed, it is clear that Plaintiff continued to take advantage of the credit line after February 25, 2008, by utilizing the line of credit up to the maximum of $250,000, and by authorizing U.S. Bank on December 19, 2009, to pay his obligations arising from this home equity line through automatic withdrawal from his checking account at Beacon Bank. Given this record, Plaintiff has not established that there is the requisite likelihood of success on the merits to justify a temporary restraining order.

### B.     Irreparable Harm

Irreparable harm is "the sine qua non for all injunctive relief." *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978).  The Supreme Court has emphasized that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 7 (2008) (emphasis in original).  If the plaintiff's injury is compensable by money damages, the plaintiff is likely not entitled to a temporary restraining order.  *See NewLeaf Designs, LLC v. BestBins Corp.*, 168 F. Supp. 2d 1039, 1045 (D. Minn. 2001) (citing *Bloom v. O'Brien*, 841 F. Supp. 277, 279 (D. Minn. 1993) (explaining that to show irreparable harm plaintiff must show that harm is not compensable by money damages)); *Ben-Yonatan v. Concordia Coll. Corp.*, 863 F. Supp. 983, 986 (D. Minn. 1994) ("Plaintiff must first establish that harm will result without injunctive relief and the harm will not be compensable by money damages . . . . The absence of such a showing along is sufficient to deny a preliminary injunction."); *see also Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) ("[E]conomic loss does not, in and of itself, constitute irreparable harm . . . . Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [petitioner]'s business.").  Failure to show irreparable harm alone is a sufficient

basis for a court to deny injunctive relief.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987).

Plaintiff has not sustained the burden of showing irreparable harm.  At best, Plaintiff's claim is that the loan agreement that authorized U.S. Bank to withdraw monthly payments from his checking account was terminated or expired in February 2008.  But even if he were to prevail on that claim, monetary damages would compensate him for U.S. Bank's breach.  And further, it is unclear whether U.S. Bank would owe Plaintiff anything at all even assuming there was a breach because it is not disputed that in December 2010, when the automatic payments started, Plaintiff owed U.S. Bank $250,000 from his overdrafts.  Plaintiff cannot, under these circumstances, show irreparable harm.

### C. Balance of Harms

The third *Dataphase* factor to be considered is whether the harm to the movant in the absence of injunctive relief outweighs the potential harm that granting injunctive relief may cause to the non-movant.  *See Dataphase*, 640 F.2d at 114.  Plaintiff claims that the automatic payments from his checking account are causing him financial hardship.  But he provides no further specifics about his financial condition, or whether the withdrawals are having an indirect effect on other payment obligations he might have.  He simply makes the conclusory statement that U.S. Bank's actions have created financial hardship.

The record reflects, however, that the bank provided a loan in the form of a line of credit to Plaintiff to the tune of $250,000, relying on the terms in the loan agreement requiring repayment pursuant to the repayment schedule through the automatic withdrawal from Plaintiff's designated checking accounts. Approximately $250,000 was in fact loaned to Plaintiff for his benefit. Plaintiff fails to explain how his repayment obligation will be met if not through the enforcement of the terms of the loan agreement. Here, the balance of harm therefore favors U.S. Bank.

### D.   Public Interest

The final *Dataphase* factor to be considered by the Court is whether injunctive relief is in the public's interest. *See Dataphase*, 640 F.2d at 114. In light of the fact that Plaintiff has not shown that he is likely to succeed on the merits and that he has made no showing that U.S. Bank has engaged in any predatory lending practices or wrongdoing, the public interest would not be served by the entry of a temporary restraining order in this case.

### RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, and because all of the *Dataphase* factors weigh in U.S. Bank's favor, **IT IS HEREBY RECOMMENDED** that:

      1.      Plaintiff's Motion for Temporary Restraining Order (Doc. No. 21), be **DENIED**.

Date:  May 20, 2011

                        *s/ Jeffrey J. Keyes*
                        JEFFREY J. KEYES
                        United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 3, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.